Petition of BUCKEYE S. S. CO.
The MARIPOSA.
No. 3407.

United States District Court.
N. D. Ohio, E. D.
May 2, 1950.

Leckie, McCreary, Schlitz & Hinslea, Cleveland, Ohio, for petitioner.

McKeehan, Merrick Arter & Stewart, Cleveland, Ohio, Bodman, Longley, Bogle, Armstrong & Dahling, Detroit, Mich., Paul Lamb, Gilbert R. Johnson, Cleveland, Ohio, for claimants.

JONES, Chief Judge.

This is a petition to limit the liability of the charterer of the Steamer Mariposa which collided with a railroad bridge on May 6, 1944.

It having been determined that petitioner was entitled to limit its liability, the cause was referred to a Commissioner for determination of the value of the Mariposa in her damaged condition after the collision and for determination of each claimant's damages.

The Commissioner's report now has been filed. The petitioner excepts to the finding that the value of the Mariposa in her damaged condition was $215,838.67 or $40,428.-83 and to the finding that all claimants are entitled to interest from August 2, 1944. The claimant Ford Motor Company excepts to the Commissioner's denial of two of its items of damage and the petitioner excepts to the suggested fee bill of the Commissioner.

The Mariposa was repaired shortly after the collision and all parties agree that the cost of repairs, $30,363.83, must be deducted from the value of the ship in its undamaged condition.

All of the parties also agree that the case, Standard Oil Co. of New Jersey v.

Southern Pacific Co. (The Proteus), 268 U.S. 146, 45 S.Ct. 465, 467, 69 L.Ed. 890, states the applicable methods by which the value of the Mariposa is to be determined.

The case states that: "* * * In case of total loss of a vessel, the measure of damages is its market value, if it has a market value, at the time of destruction. * * * Where there is no market value, such as is established by contemporaneous sale of like property in the way of ordinary business, as in the case of merchandise bought and sold in the market, other evidence is resorted to. The value of the vessel lost properly may be taken to be the sum which, considering all the circumstances, probably could have been obtained for her on the date of the collision; that is, the sum that in all probability would result from fair negotiations between an owner willing to sell and a purchaser desiring to buy. * * *"

Benedict on Admiralty, 6th Ed., Vol. 3, Sec. 501, states the same rule as follows: "Contemporaneous sales are usually the best evidence of the vessel's value, but where such evidence is not available, other sources of information may be considered. * * * The value of the ship's stores must be included in the appraisal."

The Commissioner found that the value of the Mariposa was established by contemporaneous sales of like property. It is, therefore, unnecessary to consider the alternate methods of valuation provided in the Proteus case and in Benedict.

The Mariposa, herself, was sold by the petitioner to the U. S. Maritime Commission shortly before the accident for $246,202.50. The Commissioner deducted the cost of repairs and determined the value of the Mariposa in her damaged condition to be $215,838.67. The Mariposa actually was turned over to the Maritime Commission and the $246,202.50 was applied to the purchase price of a Maritime Commission ship purchased by the petitioner.

The private sale of the Steamer Princeton was also held to be a contemporaneous sale of like property. The Commissioner found that the carrying capacity of the Mariposa was 55% of the Princeton and by taking 55% of the purchase price of the Princeton he arrived at the value of $68,924.69 for the Mariposa in her undamaged condition. By subtracting the cost of repairs and adding the value of the coal in the Mariposa's bunkers, the Commissioner set the value of the Mariposa in her damaged condition at $40,428.83. The Commissioner states that either one of these values will amply provide for all the claims but he indicates that $215,838.60 is the true value of the Mariposa. The petitioner, as noted, excepts to both findings of value.

In considering exceptions to a Commissioner's findings it should be noted that such findings are presumptively correct, Admiralty Rule 43½, 28 U.S.C.A.; they are not to be disturbed unless they are clearly erroneous, Pioneer Import Corp. v. The Lafcomo, 2 Cir., 159 F.2d 654, and the party who excepts to the Commissioner's conclusions has the burden of proof that the Commissioner was mistaken in his conclusions. The Perry G. Walker, D.C., 216 F. 423.

The petitioner is correct in its claim that the Commissioner was clearly in error in holding the value of the Mariposa to be $215,838.67. The evidence shows that during the early part of the war the Maritime Commission built several lake ships at a cost of about two and a half millions each. It wished to sell these ships to private owners but was unable to do so because of the excessive price. A formula was worked out by which owners of old lake ships traded in their old ships as part of the purchase price of Commission ships. Some 30 ships were turned over and each one of these was valued at $63.75 per carrying ton. By this scale the Mariposa was worth $246,202.50. The fact that no consideration was given to such factors as the age, condition, equipment and repairs made on the individual ships leads to the conclusion that this figure of $63.75 was arbitrary and had no relation to the true value of each ship. It was merely a method by which the Commission could unload the ships it then owned.

Secondly, the Princeton, 18 months·after the "sale" of the Mariposa, in a· sale· between two ·private owners brought only $125,000. If the Maritime scale had been used, the· value of the Princeton should have been some $420,000. It is true that there· were eighteen months difference· in· time between the two sales but the war and all its influences upon value and price was still in existence and there was no change of conditions which could explain a depreciation in value of some $300,000. From this it is fair to conclude that the buyer and seller of the Princeton were concerned only with profit and loss, and valued the Princeton according to business practices, and that the $63.75 per carrying ton value fixed for the Mariposa by the Commission in no way reflected the then true market value.

It follows that the true value of the Mariposa in her damaged condition was not $215,838.67.

It is my opinion, however, that the value of $40,428.83 is the correct value of the Mariposa, and that the petitioner had not shown the Commissioner to be clearly in error in arriving at this value. The method used by the Commissioner is explained above but the petitioner claims that since the Mariposa was eight years older than the Princeton that a 16% deduction should have been made to make up for the difference in ages between the two ships. The evidence shows, however, that the Mariposa was completely rehulled. in 1919, reboilered in 1924-25, and from 1929 to 1941 that $12,000 worth of new equipment was added to ·her. In effect the Mariposa was in considerable better condition than her age alone. would indicate. Thus it must be concluded that the Commissioner considered these facts and felt that the difference in age between the two ships was canceled out by the improvements made on the Mariposa.

Petitioner also showed that certain of the Great Lakes ship owners allow for obsolescent depreciation of their ships with carrying capacities under 12,000 tons. Their scale allows a 10% depreciation for each: 2,000 carrying .tons under 12,000. Since the Princeton was 3,000 carrying tons larger than the Mariposa, it is claimed that an additional 15% deduction should have been made by the Commissioner. The evidence shows, however, that this scale is not in general use throughout the Great Lakes region and was used at the time of its inception for a purpose not connected with ordinary depreciation of lake ships. Furthermore, there was conflicting· evidence as to whether the Mariposa was obsolete. The Commissioner apparently thought that the Mariposa could have been used as profitably percentagewise in some of the lake carrying trades as the Princeton. There is, therefore, no reason to hold that the Mariposa was more obsolete than the Princeton and no additional deduction need be made for obsolescence.

Finally, petitioner contends that the ore carrying contracts of the Princeton were included in the ·sale price of $125,000. At the time of sale and up to the present date no ship on the Great Lakes has had any problem in obtaining cargoes. The value of the Princeton, then, was not enhanced by those contracts and there was no error on the Commissioner's part when no deduction was made because of these contracts.

[4] It is my opinion that the value of the Mariposa in her damaged condition was $40,428.83.

An exception also has been taken to the allowance of interest. In admiralty the granting of interest rests in· the discretion of the trial court. The general rule, unless special ·circumstances compel a different conclusion, is that interest on damages should be computed from the date of collision or from the date when payment for necessary repairs was actually made. In re Great Lakes Dredge & Dock Co., D. C., 250 F. 916. In an unreported admiralty case recently before this Court, Interstate Steamship Co. v. Duluth-Superior Dredging Co., No. 3307, the Commissioner followed the rule of the Great Lakes case. This finding was approved by the Court and the Court of Appeals for this District, 145 F.2d 233. The Commissioner committed

no error in allowing interest as of the date of payment for necessary repairs.

However, the only payments for repairs which the evidence shows were made on a specific date are those made by the claimant, Detroit, Toledo and Ironton R. R. Co. The damages of the New York Central, Great Lakes Towing Co. and the Ford Motor Company were stipulated, but there is no statement in the evidence of the dates when these companies made payments for repairs. It would seem clearly erroneous in light of the above cases to allow interest to run from a date which may or may not have been the time when these claimants made payments. The Court feels, therefore, that interest should be computed from the date when the stipulations as to damages were made. The interest on the claim of the Detroit, Toledo and Ironton R. R. Co., however, should be computed according to the Commissioner's finding.

The Ford Motor Company excepts to the denial of two of its claims for damages. The accident occurred May 6, 1944 at approximately 6:20 p. m. The collision occurred in the Short Cut Canal leading to the Ford River Rouge Plant and caused the complete obstruction of this channel. The Ford Motor Company was the owner of the Barge Lady Kytle and its cargo and was the owner and consignee of the cargo of the Steamer James Watt. The Kytle commenced loading at Toledo on the day of the accident at 7:10 p. m. and departed at 8:41 p. m. The Watt commenced loading at Manistee, Michigan at 10:30 p. m. the same day and departed at 2:30 a. m. Both vessels were bound for the Ford River Rouge Plant by way of the Short Cut Canal. The obstruction forced both vessels to make use of a different channel and because of the depth of the alternate channel, both were forced to lighter before they could use it. The cost of lightering and forwarding that part of the cargoes to River Rouge was not allowed as damages by the Commissioner.

According to the evidence Ford knew of the complete obstruction of the channel not later than 9:00 p. m. of the day of the accident. It was, however, aware of the accident some time before this because it had a tug investigating the accident and the condition of the channel. On the authority of the New York, N. H. & H. R. R. Co. v. Piscataqua Nav. Co., 1 Cir., 108 F. 92, the Commissioner denied these claims. This case allowed claims of vessels which were obstructed in proceeding up a channel to discharge at places to which they were consigned if the vessels had departed before information of the obstruction was received.

It is true that neither the Kytle nor the Watt knew of the obstruction before they departed but the Commissioner felt in light of present day communication that the Piscataqua case should be interpreted to mean departure before information of the obstruction was received or before it reasonably could have been received. He felt that Ford, once it learned of the accident which was prior to the time that either of the ships departed, had the duty to notify the masters of both vessels as to the situation and delay their departure until full information had been received. Ford had ample time to do this and, if it had done so, the damages caused by the lightering of both vessels could have been avoided. Since Ford failed to take the necessary steps to lessen damages, the Commissioner denied its claims in respect of these two vessels.

The Commissioner was correct in so holding. His interpretation of the Piscataqua case in light of modern methods of communication is not erroneous, and there is sufficient evidence in the record to support his findings that Ford could have prevented the damages caused by the forced lightering. These two claims were properly denied.

Petitioner also excepts to the Commissioner's proposed fee bill of $2,000. The Court has considered the objections and the reasons advanced in support thereof. The fixing of fees for commissioners, like those of special masters, is a difficult function and they are not always easy to evaluate. However, I have examined the

Commissioner's suggested fee bill and have read his memorandum further specifying the services performed by him. My conclusion is that $2,000 is not excessive, but responds fairly, but justly to the extent and character of the work performed, and will be allowed.